**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

**MARY E. McCRACKEN,**

       **Plaintiff,**

**-v-**                       **CASE NO. 2:10-CV-398-FTM-JES-DNF**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**
_____/

## REPORT AND RECOMMENDATION

      This matter is before the Court on the Plaintiff's complaint (Doc. #1), seeking review of the final decision of the Commissioner of Social Security of the Social Security Administration ("the Commissioner") denying her claim for a period of disability, disability insurance benefits ("DIB") and Supplemental Security Income[1] ("SSI"). The Plaintiff timely pursued and exhausted her administrative remedies making this claim ripe for judicial review pursuant to 42 U.S.C. § 405(g) and 1383(c).

      The Commissioner has filed a transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties have filed legal memoranda. For the reasons set forth below, the Court respectfully recommends that the Commissioner's decision be **AFFIRMED.**

---

[1]     The disability definitions for "DIB" and "SSI" are identical, cases under one statute are persuasive as to the other. *Paterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir. 1986; *McCruter v. Bowen,* 791 F.2d 1544, 1545 n.12 (11th Cir. 1986).

1

## I.    SOCIAL SECURITY ACT ELIGIBILITY, THE ALJ DECISION AND STANDARD OF REVIEW

The Plaintiff is entitled to disability benefits when she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423 (d) (1)(A); 1382c(a)(3)(A). The Commissioner has established a five-step sequential evaluation process for determining whether the plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. § 416.920(a)-(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

**Background facts**:

Plaintiff failed to attend a hearing on her claim scheduled on April 1, 2008. Two Notices to Show Cause for Failure to Appear were sent by the hearing office to Plaintiff at different addresses asking her to explain why she did not attend her scheduled hearing. No response was obtained from the Plaintiff. On May 15, 2008, the ALJ dismissed Plaintiff's hearing request. Plaintiff contacted her representative on June 30, 2008, and a request for review of the ALJ's dismissal was filed. Plaintiff's counsel sent a letter of explanation regarding Plaintiff's failure to appear.

Accordingly, the Appeals Council directed the ALJ to reconsider whether Plaintiff had good reason for not appearing at her previously scheduled hearing. If the ALJ determined Plaintiff had good reason for not appearing, the ALJ was directed to provide

Plaintiff another opportunity for a hearing.

ALJ Spurlin considered Plaintiff's reason for not attending and found that Plaintiff had good reason for her failure to appear. Consequently, Plaintiff was scheduled for a hearing before ALJ Spurlin on January 14, 2010, in accordance with the Appeals Order. The Plaintiff appeared in Fort Myers, Florida, and ALJ Spurlin presided over the video hearing from Ft. Lauderdale, Florida. Plaintiff was represented by counsel. (Tr. 12).

On or about September 2, 2005, the Plaintiff filed applications for disability, disability insurance benefits and supplemental security income, alleging disability beginning March 27, 2004 (Tr. 106-118). ALJ Spurlin concluded Plaintiff has not been under a disability within the meaning of the Social Security Act from March 27, 2004, through the date of his decision, February 25, 2010.

At Step 1 the ALJ found Plaintiff had not engaged in substantial gainful activity since March 27, 2004, the alleged onset date (20 C.F.R. 404.1571 and 416.97) [Tr. 15]. At Step 2 the ALJ found the plaintiff suffered from the following severe impairment(s): chronic low back pain; poly substance abuse, in remission (20 C.F.R. 404.1520(c) and 416.920(c)). At Step 3 the ALJ found Plaintiff did not have an impairment or combination of impairments which strictly meet or medically equal the criteria of any listed impairments shown in 20 C.F.R. 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525-26, 416.920(d), 416.925-26) (Tr. 15). At Step 4 the ALJ determined Plaintiff had mild limitation in regards to activities of daily living; social functioning; concentration, persistence or pace; and Plaintiff has experienced no episodes

of decompensation of extended duration. The ALJ further determined Plaintiff has the residual functional capacity ("RFC") to perform medium work and could frequently climb, stoop, kneel, crouch, and crawl. (Tr. 16). Medium work involves lifting up to 50 pounds at at a time and up to 25 pounds frequently. 20 C.F.R. 404.1567(c) and 416.967(c). Thus, Plaintiff retained the "RFC" to perform her past relevant work as a waiter and was not disabled. (Tr. 16-20). Accordingly, the ALJ found the Plaintiff not disabled at step five of the sequential evaluation.

This Court's review is limited to an inquiry into whether the Commissioner made findings supported by substantial evidence, 42 U.S.C. §405(g), and applied the correct legal standards, see *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. Id. The court must not make credibility determinations, re-weigh the evidence, or substitute its judgment for that of the Commissioner, see *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005), but must affirm if the decision reached is supported by substantial evidence, even if the evidence preponderates against the Commissioner's findings, see *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

## II.    REVIEW OF FACTS AND CONCLUSIONS OF LAW

### (1)    Background Facts:

Plaintiff was born on August 11, 1957, and was 52 years of age at the time of her hearing and 46 years old on the alleged onset date of March 27, 2004 (Tr. 17, Finding no. 5, Tr. 37). Plaintiff attended high school through the 12th grade and later obtained a GED.

4

Plaintiff's past relevant work was as a waitress, but she also worked for several months for Wallpaper World as a floor tile preparation person (Tr. 17). Plaintiff contends she is unable to work due to degenerative disc disease in her lower back, bilateral leg pain, depression, and anxiety, as well as a history of poly substance abuse, which she maintains is in remission. Plaintiff has received treatment for her pain in the form of narcotic medications. Plaintiff alleges the medication does occasionally reduce her pain but she is still unable to work.

Dr. Michael E. Lowrey, M.D., treated Plaintiff on September 7, 2000. Plaintiff advised she had fallen off the back of a truck and bruised her tail bone. Plaintiff was seen at S.W. Florida Regional. Plaintiff was advised to follow-up with her physician and that is when she sought treatment from Dr. Lowrey. Dr. Lowrey noted anxiety and low back pain. The record shows Plaintiff was taking Ultram and Xanax. However, the record is illegible as to Plaintiff's dosage amounts and one other medication that was noted. It also cannot be determined by the record whether Dr. Lowery actually prescribed these or filled these prescriptions at this time.

Plaintiff was next seen by Dr. Lowery on October 25, 2000, where she advised she was going to Texas for a year. Plaintiff wanted refills for Xanax and Darvocet. Both prescriptions were filled. Plaintiff cancelled her appointment on August 22, 2001, and was a no show on August 24, 2001. Plaintiff kept her appointment on September 18, 2001, and advised Darvocet was not giving her relief; that she was stable on Xanax and was taking Lorcet in the evening. Plaintiff advised she was getting "good relief" from Lorcet. Plaintiff also advised Dr. Lowrey that she was working as a waitress and she was

experiencing pain by the end of the day (Tr. 335).

Dr. Lowrey's notes, dated July 15, 2002, indicate that Plaintiff was depressed, crying and experiencing low back pain.  Plaintiff was placed on Zoloft and reported feeling better emotionally and crying less (Tr. 333).  During 2003 and 2004, Dr. Lowrey continued to treat Plaintiff for low back pain (Tr. 329-332). A medication flow chart from Dr. Lowrey's office from 2000-2004 shows that Dr. Lowrey had prescribed multiple medications to attempt to control Plaintiff's chronic back pain and depression. Some of these medications included Darvocet, Lortab, Soma, Xanax and Zoloft (Tr. 331).

On  May 27, 2004[2], Plaintiff was seen at the Family Health Center for her continuing back pain.  Notes show that Plaintiff was given a Toradol injection in her right hip and a Solu-medrol injection in her left hip. No other information was legible on the "patient visit sheet" (Tr. 342).

The record shows the Plaintiff underwent an MRI of her lumbar spine without contrast on July 16, 2004.[3]  The MRI was read by Dr. Richard Pry on the same date and the MRI revealed degenerative disc disease L5-S1; broad based bulging disc at L2-3 with no compromise of the neural foramina; lateral stenosis L4-5 secondary to a broad based bulging disc and facet joint hypertrophy resulting in mild spinal stenosis; and finally, focal protrusion L5-S1 in the midline (Tr. 340, 341).

---

[2] March 27, 2004, is the date the Plaintiff alleges her disability began.

[3] It is unclear from the record when the referral for the MRI was made and what physician made the referral.

On July 22, 2004, Dr. Ahmed had an appointment with Plaintiff regarding her MRI and for an examination. Dr. Ahmed found no localized tenderness in the back; however, Plaintiff's straight leg raising test was positive. Dr. Ahmed's diagnostic impressions were low back pain with disc prolapse shown on the MRI at the L-2, L-3 and L-4, L-5 levels. Plaintiff related that she is a recovering alcoholic with a history of Hepatitis. Dr. Ahmed refilled Plaintiff's Robaxin and Lorcet-HD prescription and added Lorcet 5/500. Dr. Ahmed also recommended Plaintiff see Dr. Savage, a neurosurgeon (Tr. 339).

On November 3, 2004, Plaintiff saw Dr. J. L. Bernard for a mental status examination.[4] Dr. Bernard noted that her mood was stable and mostly appropriate. He opined that her judgment and insight were probably poor and that her short term memory was impaired in that she could only recall one of three words after a ninety second delay. He also noted that she had difficulty with her serial sevens. Dr. Bernard wondered whether Plaintiff was "high" due to her rapid speech and difficulty climbing the stairs. He noted that she had a history of polypharmaceutical and alcohol abuse. However, she had informed him that she had been clean and sober for approximately ten years. During questioning, Dr. Bernard got Plaintiff to admit that she "takes gobs of pain medicine." (Tr. 326-237) While this would appear to run contrary to her statement that she was clean and sober, she was on numerous prescribed pain medications. Further, Dr. Bernard concluded "The claimant can probably handle any benefits, with the caveat that they

---

[4]      The record is unclear whether Dr. Bernard examined Plaintiff for the Office of Disability Determinations or as stated by the ALJ in the decision "Dr. Bernard completed a clinical interview with a mental status examiner" (Tr. 18).

might be used to purchase drugs or alcohol. Dr. Bernard diagnosed her with major depression disorder recurrent, mild, and antisocial personality disorder. He indicated that her prognosis was poor (Tr. 326-327).

On November 9, 2004, at the request of the Office of Disability Determinations Plaintiff was seen by Dr. Patrick A. Ijewere, M.D., for a consultative examination and an evaluation of her degenerative disc disease and depression (Tr. 320-322). Plaintiff told Dr. Ijewere that she was experiencing back pain radiating into her hips and down her left leg. She stated that her pain at rest was 8 out of 10 and increased to 10 out of 10 with sudden turning of her back or walking or standing more than 45 to 60 minutes (Tr. 320). She also related that she left her previous job as a waitress because of memory problems (Tr. 321). Upon physical examination, Dr. Ijewere noted that while Plaintiff had no difficulty getting in and out of an armless chair or on the exam table, she did exhibit mild lumbosacral tenderness (Tr. 321). Dr. Ijewere's diagnostic impressions were degenerative disc disease, low back pain, anxiety and depression. He recommended physical therapy and massage for her low back pain and suggested that she obtain a psychiatric consultation with regard to her anxiety and depression. Finally, with respect to her back problems, he stated his belief that physical therapy and massage would allow "non physical desk work." (Tr. 322).

On November 29, 2004, a Psychiatric Review Technique Form ("PRTF") was completed by Dr. Martha W. Putney, Ph.D. Dr. Putney did not examine Plaintiff, but merely completed the PRTF. Dr. Putney found Plaintiff needed a residual functional capacity assessment and the areas that should be looked at from a mental standpoint were:

(1) affective disorder, (2) personality disorders, and (3) substance addiction disorders (Tr. 291). Dr. Putney noted that Plaintiff suffered from mild depression and anti-social personality disorder not otherwise specified (Tr. 294, 296).

In her mental RFC, Dr. Putney found Plaintiff to be moderately limited in the ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods of time. She also indicated that Plaintiff might be moderately limited in her ability to complete a normal workday and work week without interruptions from psychologically based symptoms (Tr. 316-318).

Plaintiff began seeing Dr. Ephraim G. Aguilar, M.D., a pain management specialist in November of 2004. Plaintiff advised of low back pain and the need to have pain medications refilled (Tr. 255). Dr. Aguilar discussed with Plaintiff the "side effects of meds., the abuse potential of meds., switching of meds to prevent tolerance and dependence, and exercise and other treatment aids". On December 22, 2004, Dr.Aguilar's treating notes indicate that Plaintiff advised her pain level was a 10 without medication and a 4 with medication. He noted that her ability to concentrate was "only fair" (Tr. 252). On February 16, 2005, Dr. Aguilar's records indicate Plaintiff was still experiencing back pain, needed refills on her medicine and had difficulty concentrating (Tr. 248).

Plaintiff returned to Dr. Aguilar in March and April of 2005, for continued problems with low back pain (Tr. 245-246). In August 2005, Dr. Aguilar noted Plaintiff was getting some benefit from medicine but was still having trouble concentrating but "is

able to work". Dr. Aguilar continued to see Plaintiff through the remainder of 2005. During her December follow-up appointment for back pain, Plaintiff related that she did not want to be around other people and was requesting Zoloft. In this report he noted that she was still having problems concentrating; however, he again indicated that she could work (Tr. 227). Unfortunately, Dr. Aguilar did not explain the full extent of work that Plaintiff could perform. Plaintiff was seen by Dr. Aguilar on March 20, 2006, and at that time Dr. Aguilar indicated that Plaintiff could work "part-time" (Tr. 217).

Plaintiff underwent a second psychological consultative examination on February 23, 2006, with Dr. Joseph J. White, Ph.D. (Tr. 305-307). Dr. White found that Plaintiff appeared confused during their interview and that she was a poor historian for dates and facts. Her affect was flat and depressed and she cried during the interview. Plaintiff denied any hallucinations or suicidal ideations and was not believed to be psychotic at the time. He found her judgment and insight to be fair and estimated her IQ to be in the low-average range. He noted that she had poor attention, concentration, and inadequate short-term memory. In fact, she could not do serial sevens. Dr. White stated that her diagnoses were depressive disorder NOS, anxiety disorder NOS, alcohol dependence (in remission), and polysubstance dependence (in remission). He summarized his report by stating that Plaintiff had a number of "physical deficits and a long history of depression, anxiety, and substance abuse, which are all barriers to her overall functioning." (Tr. 305-307)

On March 2, 2006, Dr. Timothy Foster, Ph.D., completed a Psychiatric Review Technique Form regarding the Plaintiff. At that time, Dr. Foster indicated that she did not have a severe mental impairment, but did have non-mental impairments requiring referral

to other medical specialists. In reaching his conclusion, he looked at both affective disorders and anxiety related disorders. With respect to functional limitations, he found her restriction of activities of daily living, ability to maintain social functioning, and difficulties in maintaining concentration, persistence, or pace to all be mild. There were no episodes of decompensation (Tr. 287). He concluded that Plaintiff's major problems were non-mental and that any limits were due to physical problems; however, she did have depression secondary to pain and anxiety. He also found that despite a history of substance abuse, she was currently in remission and it had no bearing in this case. (Tr. 189).

On March 31, 2006, Dr. Rabinowitz performed a consultative physical examination for the Division of Disability Determinations (Tr. 270-273). At this time, Plaintiff was 49 years old and her complaints were low back pain, alcoholic dependence, and Hepatitis C infection. Plaintiff advised Dr. Rabinowitz of her history of low back pain and how recently that pain had started radiating into both buttocks. She rated her average pain level as a 6 or 7 on a 10-point scale with 10 being the most severe pain. Plaintiff told Dr. Rabinowitz that she was taking Methadone in the morning and at bedtime, along with Oxycodone, as well as Xanax and Zoloft for depression. Despite these medications, Plaintiff was still symptomatic. Plaintiff advised she had difficulty with repeated bending, turning or twisting her neck, or lifting heavy objects, but could perform routine activities of daily living and was working part-time doing house cleaning (Tr. 270). Plaintiff related that she had a history of chronic alcohol abuse, but it is in remission as she has been sober for nine years. Plaintiff also related that in 2004, she was

diagnosed with Hepatitis C; however, there was no additional work-up regarding this matter and there are no treatment records (Tr. 270).

During the physical examination, Dr. Rabinowitz did not find any evidence of active joint inflammation, deformity, instability, contracture, or muscle spasms. Plaintiff's straight leg raising was negative in both the sitting and supine positions. While finding no radiculopathy, Dr. Rabinowitz found Plaintiff has a decreased range of motion of her lumbar spine without paravertebral muscle spasm (Tr. 272). Dr. Rabinowitz found Plaintiff had a history of low back pain, probably due to her degenerative disc disease and bulging disc. Plaintiff's grip strength and dexterity were normal in both hands (Tr. 272).

Dr. Rabinowitz also commented on Plaintiff's mental health - noting that Plaintiff cried spontaneously. Dr. Rabinowitz referenced Plaintiff had a history of depression and anxiety and a family history of mental illness. Plaintiff's mother died at the age of 31 in a mental hospital where she was placed after she killed Plaintiff's father (Tr. 271). Having interviewed, examined, and reviewed Plaintiff's 2004 MRI, Dr. Rabinowitz's diagnostic impressions were chronic back pain secondary to degenerative disc disease and discogenic disease without radiculopathy, alcohol dependence currently inactive, and chronic Hepatitis C infection untreated (Tr. 273).

Plaintiff returned to Dr. Aguilar on May 12, 2006, for low back pain. During this appointment, he limited her ability to work to 2 hours a day (Tr. 213). On July 27, 2006, Plaintiff went to Lee Memorial Health Center, Inc., for assistance with extreme depression, social isolation, social phobia, and anxiety. Although there is a long intake evaluation, there is no indication that she received treatment (Tr. 177-191).

12

Dr. Aguilar continued to see Plaintiff during August of 2006 for chronic low back pain and depression (Tr. 200-204). During the October 6, 2006, appointment, Dr. Aguilar had indicated that Plaintiff could work at "light duty." (Tr.198).

On October 18, 2006, Plaintiff began treatment at the Hollywood Pain Management Center (Tr. 485-486). During her initial appointment, she stated that her symptoms had progressively worsened over the years and that approximately two years ago it began to affect her ability to perform her activities of daily living. She also indicated that she suffers from depression, anxiety, and has been diagnosed with Adult Attention Deficit Disorder (AADD). Her primary physical complaint was severe lumbosacral and bilateral leg pain. Her deep tendon reflexes were 2+ and her gait was fair. The diagnosis from this initial visit was:

1.  Lumbar spine: Degenerative disc disease; bulges at L-2-L-3 and L-4, L-5; joint arthropathy, stenosis and bulges at L-4-L-5; protrusions at L-5-S-1.
2.  Bilateral leg sciatica with pain.
3.  Chronic pain syndrome. (Tr. 486)

Based on these diagnoses, Plaintiff was prescribed Xanax, Methadone, and Roxicodone. Plaintiff started receiving her treatment on a regular basis from the Hollywood Pain Management Center with her first regular appointment being November 1, 2006. During that appointment she complained of severe lumbosacral pain and bilateral sciatica. She said that the medicine was helping with the pain, but she was still very depressed. Upon examination it was noted that her back was tender to palpation with a decreased range of motion and that she was experiencing bilateral sciatica in her legs with pain (Tr. 483). In addition to the notes from the Hollywood Pain Management Center for

late 2006, there are also notes from Dr. Aguilar for the later portion of 2006 (Tr. 192-199). In his treatment note, dated December 4, 2006, Dr. Aguilar stated that while she could function, she could not drive or work (Tr. 193).

Plaintiff continued to be seen on a monthly basis at the Hollywood Pain Management Center. When Plaintiff was seen on January 2, 2008, for follow-up for her back pain, her treatment notes indicated that she may need a psychiatric consultation.

On March 26, 2008, Plaintiff was seen by Dr. Ossorio for complaints of lumbosacral pain and bilateral leg pain. Upon examination, her lumbosacral area was tender to palpation and she had a reduced range of motion; in addition to bilateral leg pain.

On September 24, 2008, a Mental Residual Functional Capacity Evaluation was completed by Robert J. Eardley, M.D. In completing this questionnaire, Dr. Eardley indicated that this questionnaire was more appropriate for a psychologist or psychiatrist treating the patient and that his specialty was to manage the Plaintiff's pain. Having written that, Dr. Eardley did comment on her physical condition and pain noting that Plaintiff's physical condition was chronic and "it is likely that stress would only exacerbate her current condition". He also commented that he felt that she was emotionally unstable and was ill equipped to handle stress (Tr. 432).

Plaintiff continued to be seen by Drs. Eardley and Ossorio for pain management throughout the remainder of 2008 and 2009. The results of her examinations were fairly consistent with her having lumbosacral tenderness to palpation and decreased range of motion as well as bilateral leg pain.

On March 30, 2009, Dr. Ossorio completed a Physical Capacity Evaluation (Tr 385-386). In his evaluation, he noted that Plaintiff could stand or walk no more than one hour at a time and could sit no longer than one hour at a time. He opined that she could not lift any weight. Further, "while she has no problems with simple grasping, she cannot use her feet for repetitive movement in operating foot controls". As to the postural limitations of bending, squatting, crawling, and kneeling, he opined that she would be unable to perform those activities as well as being unable to reach above her shoulders (Tr. 385-386).

Drs. Ossorio and Eardley continued to see Plaintiff during the remainder of 2009 for low back pain and sciatica. In August of 2009, Plaintiff was seen for back pain and a throbbing left knee. During this visit, she was prescribed Roxicodone, Methadone, Xanax, and Prozac. This note also indicates that Plaintiff needed a referral to a psychiatrist for depression (Tr. 394).

III.    **SPECIFIC ISSUES:**

    (A)    **SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S FINDINGS AS TO PLAINTIFF'S ALLEGED MENTAL IMPAIRMENTS**

Plaintiff argues the ALJ did not properly evaluate her alleged mental limitations in assessing her RFC (Pl's Br. at 14-17). The record shows the ALJ discussed evidence and medical opinions pertaining to Plaintiff's mental health (Tr. 15-20), and his RFC determination is consistent with his finding that mental health concerns caused only mild limitation on Plaintiff's activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace and there were no episodes of decompen-

sation (Tr. 15-20).

In addition, Plaintiff failed to show she had mental limitations that affected her ability to engage in work related activity. Plaintiff never went for treatment concerning any mental health issues and reported daily activities that undermined her subjective complaints of mental health symptoms.

In considering an alleged impairment, an ALJ must evaluate evidence about its "functionally limiting effects" to assess the effect on the individual's ability to do basic work activities. (SSR) 96-3p, 1996 WL 374181 (S.S.A.). Further, the ALJ must measure the impairment's severity by its effect on the ability to work, "not simply in terms of deviation from purely medical standards of bodily perfection or normality." *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986).

The medical record does not support Plaintiff's allegations of disabling mental limitations. Since Plaintiff had no mental health treatment, the observations of physicians who are not mental health specialists and the notes from evaluations of consulting and state agency psychologists are the only source of information as to Plaintiff's mental health.

When consultative psychologist Dr. Bernard examined Plaintiff on November 2004, Plaintiff reported getting Bs in school, cleaning house, doing puzzles, and watching television (Tr. 326-328). On exam, Plaintiff was cooperative and fully oriented with a good attitude, rational and clear thought processes, stable, with appropriate mood. (Tr. 326-327). Dr. Bernard suspected Plaintiff was abusing drugs, noting she reported taking "gobs of pain killers," made inappropriate jokes, and seemed "high," with rapid

speech, poor judgment and insight, and impaired short-term memory (Tr. 326-327). Dr. Bernard made no finding that mental health concerns limited Plaintiff's work abilities in any way (Tr. 326-328).

On November 9, 2004, consultative examiner Dr. Ijewere noted, while Plaintiff was moderately anxious, she related well to staff and displayed intact cognition and normal mood and affect (Tr. 320-325).

On November 29, 2004, state agency psychologist Dr. Putney reviewed Plaintiff's medical record and found that despite moderate limitations, her mental impairments did not meet the B or C criteria of the mental health listings (Tr. 291-304, 316-319). Dr. Putney specified that, when sober, Plaintiff could understand and remember simple procedures and instructions, perform simple tasks, make work decisions, exhibit appropriate interpersonal skills, and adapt to a simple work setting (Tr. 318).

In February 2006, consultative psychologist Dr. White noted, though Plaintiff appeared confused, depressed, and somewhat tearful, Plaintiff was oriented and appropriately dressed with good hygiene, normal speech, fair judgment and insight, average intelligence, and no suicidal or homicidal ideation, hallucination, thought disorder, or psychosis (Tr. 305-307).

On March 2, 2006, state agency psychologist Dr. Foster reviewed Plaintiff's record and opined her mental impairments were not severe and caused no more than mild limitations and no episodes of decompensation and that any severe limitations she had were due to her physical impairments (Tr. 277-290).

On March 31, 2006, consultative examiner Dr. Rabinowitz noted, though somewhat tearful, Plaintiff appeared capable of handling her own funds and was fully oriented with intact memory appropriate behavior, appropriate dress, and adequate ability to relate (Tr. 272).

On intake to Lee Mental Health Center in July 2006, Plaintiff indicated she got mostly As and Bs in school, got along with teachers and peers, and enjoyed puzzles in her free time (Tr. 177-191). A counselor referred Plaintiff for supported employment services, but she never kept any appointments and eventually was discharged from the program (Tr. 177-178).

In September 2008, pain management specialist Dr. Eardley filled out a questionnaire indicating Plaintiff had mild to moderate limitations in her mental abilities to do work related activity (Tr. 429-432). However, Dr. Eardley added that he treated Plaintiff for pain, and the questionnaire would be better executed by a treating mental health professional (Tr. 432).

After reviewing all the evidence of record, the ALJ assessed the severity of Plaintiff's alleged mental impairments and found that her mental health concerns caused no episodes of decompensation and only mild limitation on her activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace (Tr. 31).

The ALJ clearly and concisely considered the limited medical evidence that existed as to Plaintiff's alleged mental impairments and accordingly found that Plaintiff 's alleged mental impairment was not severe and did not cause any additional limitations to her RFC. Substantial evidence as described supports this finding.

**(B)**      **THE ALJ APPLIED THE PROPER LEGAL STANDARDS IN EVALUATING MEDICAL OPINIONS, AND SUBSTANTIAL EVIDENCE SUPPORTS HIS FINDING AS TO PLAINTIFF'S RFC.**

In determining Plaintiff's RFC, the ALJ considered all the medical evidence, including the assessments and exams of consultative examining psychologists Dr. Bernard (Tr. 18, 326-328) and Dr. White (Tr. 18-19, 305-307), treating pain management specialists Dr. Ossoria (Tr. 385-386) and Dr. Eardley (Tr. 17, 19, 169-175, 429-432) and state agency physician Dr. Kline (Tr. 18, 262-269).

Plaintiff argues the ALJ improperly gave controlling weight to Dr. Bernard's opinions and findings (Pl. Br. at 18), yet Dr. Bernard was one of only two mental health specialists, the other being Dr. White, that ever examined Plaintiff. As noted, Dr. Bernard made largely normal findings, except for certain behaviors that made him suspect Plaintiff was abusing drugs (Tr. 326-328).

Dr. Bernard's normal findings were generally consistent with Dr. White's findings that Plaintiff was fully oriented with appropriate dress, good hygiene, normal speech, fair judgment and insight, average intelligence, and no suicidal or homicidal ideation, hallucination, thought disorder, or psychosis (Tr. 305-307). Given these normal findings, the ALJ properly found Plaintiff did not suffer any significant work-related mental limitations (Tr. 15-20). While Dr. White indicated Plaintiff's physical deficits and mental impairments, together, were a barrier to her overall functioning (Tr. 307), a vague statement given by a non-treating source and not a specific judgment about the nature and severity of Plaintiff's impairments, was not entitled to any special weight or deference.

§§ 404.1527(a)(2), (d), 416.927(a)(2), (d).

Plaintiff also notes, with regard to Dr. Bernard's opinion, that a one-time examiner's opinion, unlike a treating source's opinion, is not entitled to controlling weight (Pl. Br. at 19). The ALJ, however, may give any medical opinion controlling weight if the opinion is, as Dr. Bernard's assessment and findings were, supported by the relevant evidence, consistent with the record as a whole, and rendered by a specialist about medical issues related to his area of specialty. §§ 404.1527(d), 416.927(d).

Similarly, the ALJ properly failed to give Dr. Eardley's assessment of Plaintiff's mental limitations (Tr. 429-432) great or controlling weight because, as Dr. Eardley admitted, he was seeing the Plaintiff for pain management only, and the questionnaire "would be better executed by a treating mental health professional" (Tr. 19, 432). 20 C.F.R. §§ 404.1527(d)(2)(ii); 416.927(d)(2)(ii). *Edwards v. Sullivan*, 937 F.2d 580, 582 (11th Cir. 1997). In this case, Dr. Eardley's opinion was not supported by medically acceptable diagnostic techniques and conflicted with the findings and opinions of the mental health professionals of record.

Plaintiff also argues the ALJ erred in relying on Dr. Kline's opinion to discredit Dr. Ossoria's responses to a March 30, 2009, questionnaire (Tr. 385-386). Dr. Ossoria's responses were extremely restrictive and internally inconsistent, indicating, among other things, that Plaintiff could not stand, walk, lift, bend, squat, crawl, or climb, could sit for 1 hour at a time but could not sit for any hours total in an 8-day (Tr. 385-386). However, the ALJ properly considered Dr. Ossoria's opinion.

The ALJ declined to give Dr. Ossoria's opinion great or controlling weight because it was inconsistent with and departed substantially from the remainder of the evidence (Tr. 19). A treating source opinion is only entitled to controlling weight if well-supported by medically acceptable diagnostic techniques and consistent with other substantial evidence of record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); SSR 96-2p; *Edwards v. Sullivan*, 937 F.2d 580, 582 (11th Cir. 1997). An ALJ should give "good reasons" for the weight given the opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The Eleventh Circuit has noted an ALJ should articulate "good cause" for not according a treating source opinion great or controlling weight. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004). Good cause exists where: (1) the evidence did not bolster the opinion; (2) the evidence supported a contrary finding; or (3) the opinion was conclusory or inconsistent with the physician's own records. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).

In compliance with the regulations and case law, the ALJ articulated good reasons for declining to give Dr. Ossoria's assessment great or controlling weight (Tr. 24). The record simply does not support a more restrictive assessment of Plaintiff's ability to do work activity than the ALJ's RFC finding. The ALJ discussed in detail the evidence indicating that although Plaintiff complained of pain and other symptoms, she did not suffer physical limitations beyond those for which the ALJ accounted in 2004.

In May 2004, Plaintiff complained of worsening back pain to her primary care physician, who gave her an epidural steroid injection and ordered a lumbar spine x-ray (Tr. 342). A July 2004 MRI of Plaintiff's lumbar spine revealed some lumbosacral

degenerative disc disease and some bulging lumbar discs producing only mild stenosis (Tr. 340-341). On exam a few days later, Dr. Ahmed noted no abnormal findings except a positive straight leg raise test with no accompanying localized tenderness in the back (Tr. 338-339). Plaintiff continued to manage her back pain with pain medications from a clinic until September 2004, but their records contain no other physical findings (Tr. 329-337).

In October 2004, Plaintiff began seeing Dr. Aguilar for management of back and leg pain (Tr. 261). Dr. Aguilar noted that, though Plaintiff had been taking pain medication for 2 years, she had never had an MRI (Tr. 261). On November 9, 2004, consultative physician Dr. Ijewere examined Plaintiff and made completely normal physical findings, except for some mild lumbosacral tenderness with no decreased range of motion or neurological deficit (Tr. 320-325). At numerous visits from November 2004 until December 2006, Dr. Aguilar recommended that Plaintiff exercise (Tr. 192, 203, 205, 209, 213, 215).

In May 2005, Plaintiff began reporting that her pain with medication was at four out of ten, with ten being the most painful (Tr. 194, 237, 241-242). In October 2005, she began rating her pain at a 3 (Tr. 200, 231). In December 2005, Dr. Aguilar began noting Plaintiff could work, drive, and perform housework (Tr. 194, 213, 215, 225, 227). In December 2006, Plaintiff rated her pain at a 2 (Tr. 193). At no time did Dr. Aguilar record any physical exam findings other than mild muscle spasm in her lower back (Tr. 192-261).

On March 31, 2006, consultative physician Dr. Rabinowitz examined Plaintiff and made completely normal physical findings, except for some decreased range of motion in the lumbar spine with no accompanying muscle spasm or neurological deficit (Tr. 270-276).

In April 2006, Dr. Kline reviewed Plaintiff's medical record (Tr. 262-269). Dr. Kline noted Plaintiff's lack of surgical history, relatively normal physical exam findings, and an MRI showing no neurocompression, Dr. Kline opined Plaintiff could do medium work with no additional limitations (Tr. 262-269). The only abnormal "objective" findings at follow-up visits from November 2006 to September 2009 were non-specific notations of tenderness or spasm in Plaintiff's back with reduced range of motion, leg pain with numbness and tingling, and anxiety by history (Tr. 391-408, 416-427, 433-483). Plaintiff consistently reported medication was helping her symptoms (Tr. 392). In January 2007, Plaintiff indicated that she was employed and that medication had improved her pain by 75% (Tr. 175).

Dr. Arnold opined that she was receiving too much medication for her disease process (Tr. 176). After adjusting her medications, Dr. Arnold noted in February, March, and April 2007 that Plaintiff had no adverse reactions (Tr. 169-174). Plaintiff continually specified that she was able to perform activities of daily living without difficulty and was experiencing improved quality of life (Tr. 169-175). On exam, Plaintiff always appeared bright with normal findings except for painful range of motion in her lumbosacral region (Tr. 169-175).

In addition to the unremarkable findings and routine and conservative treatment described, Plaintiff's own reports of her activities further undermine Dr. Ossoria's assessment. Plaintiff's testimony that she carried groceries, did yard work and pool maintenance (Tr. 503, 508) refutes Dr. Ossoria's assertion that she was physically unable to lift, bend, squat, crawl, or climb and could not sit, stand, or walk for more than one hour (Tr. 385-386). This substantial evidence supports the ALJ's decision not to adopt Dr. Ossoria's opinion because it was inconsistent with all of the other evidence (Tr. 19). Although Plaintiff disagrees with the ALJ's RFC finding and the evaluation of Dr. Ossoria's opinion, Plaintiff has proffered no objective medical evidence or records from another physician that supports her allegation of disability.

Plaintiff also argues the ALJ improperly relied on the opinion of Dr. Kline, a non-examining physician, but the ALJ did not accord Dr. Kline's opinion any undue weight or adopt it outright (Tr. 18). Dr. Kline opined Plaintiff could perform the physical demands of medium work with no other restrictions (Tr. 262-269). The ALJ clearly did not adopt Dr. Kline's opinion, since he found Plaintiff had additional limitations with regard to postural activity (Tr. 16-20). In any event, the opinions of non-examining sources may override opinions from treating sources, if the record evidence supports the non-examining source's opinion. 20 C.F.R. §§ 404.1527(d), (f), 416.927(d), (f); *Edwards*, 937 F.2d at 584-85. The ALJ properly relied on the substantial evidence described above to determine that Plaintiff's RFC allowed her to perform her past relevant work and was, therefore, not disabled.

**(C)** **SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S
FINDING THAT PLAINTIFF'S SUBJECTIVE COMPLAINTS
WERE NOT FULLY CREDIBLE**

The ALJ determined that Plaintiff failed to show that her pain or other subjective symptoms prevented her from performing work. Plaintiff's medical records demonstrate the Plaintiff was capable of work activity within the range the ALJ identified in his RFC finding. When a claimant attempts to establish disability based on subjective complaints, she must produce (1) evidence of an underlying medical condition and (2) objective medical evidence either (a) confirming the severity of alleged symptoms or (b) indicating that the medical condition could be reasonably expected to cause symptoms as severe as alleged. 20 C.F.R. §§ 404.1529, 416.929; *Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002). If the objective medical evidence does not confirm the severity of the alleged symptoms but indicates that the claimant's impairment could reasonably be expected to produce her alleged symptoms, an ALJ must evaluate the intensity and persistence of her alleged symptoms and their effect on her ability to work and how credible those allegations are. 20 C.F.R. §§404.1529(c)(1); 416.929(c)(1); *Wilson*, 284 F.3d at 1225-26. If an ALJ finds the claimant's allegations are not credible, he should explain why.

In this case, Plaintiff proved her impairments caused pain and other symptoms, but did not present evidence confirming the severity of those symptoms (Tr. 16-20). As the ALJ explained, although Plaintiff may have had some physical and mental limitations because of her condition, she was still capable of performing some work-related activity (Tr. 16-20).

While Plaintiff complained consistently of pain and other symptoms, and medical records document her complaints, such notations do not constitute objective medical evidence, and a doctor's report that merely repeats the assertions of a patient whom the ALJ does not find credible is not objective medical evidence and should not receive significant weight. 20 C.F.R. §§ 404.1528, 404.1529, 416.928, 416.929; *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007). As the ALJ noted Plaintiff received conservative treatment for her pain complaints and many times went without any treatment at all (Tr. 19-20).

The ALJ further noted indications in the record that Plaintiff was not completely truthful in her reports about her use of drugs (Tr. 17). An October 2004 drug screen revealed trace amounts of phenecyclidine, tricyclic anti-depressants, and cocaine in Plaintiff's urine (in addition to the opiates, benzodiazepines, and methadone she was prescribed Tr. 257)). Dr. Bernard suspected Plaintiff was abusing drugs in November 2004 (Tr. 326-327). In May and October 2006, Plaintiff was confronted about callers to Dr. Aguilar's office that Plaintiff was selling her medications (Tr. 197, 212), and her June and November 2006 drug screens were negative for her opiate medication (Tr. 196, 211). This evidence casts doubt on Plaintiff's honesty.

The ALJ's decision reflects that he properly considered all the medical evidence in making his findings as to Plaintiff's credibility and RFC (Tr. 16-20). Plaintiff failed to prove her subjective symptoms caused limitations on her ability to work beyond those included in these findings. Substantial evidence supports the ALJ's findings.

**(D)** **SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S FINDING THAT PLAINTIFF COULD PERFORM HER PAST RELEVANT WORK**

The ALJ found at the fourth step of the sequential evaluation process that Plaintiff could perform her past relevant work as a waiter (Tr. 20). 20 C.F.R. § 404.1520(a)(4)(iv); § 416.920(a)(4)(iv). An ALJ is not required to consult a VE in determining whether a claimant can perform his past relevant work. *Lucas v. Sullivan*, 918 F.2d 1567, 1573 (11th Cir. 1990); *Schnoor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

The ALJ properly relied on the Dictionary of Occupational Titles (DOT) to find Plaintiff could perform her past relevant work as generally performed in the national economy (Tr. 20). 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); SSR 82-61; *U.S. Dep't of Labor*, DOT § 828.261-022, 1991 WL 672688 (waiter/waitress, informal) (4th ed. 1991). The DOT provides substantial evidence to support the ALJ's finding that Plaintiff's past relevant work as generally performed did not involve demands in excess of her RFC (Tr. 20). 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); SSR 82-61. Given the substantial evidence discussed repeatedly throughout this brief in support of the ALJ's RFC finding, Plaintiff failed to meet her burden of proving she could not perform her past relevant work as generally performed in the national economy.

## IV. CONCLUSION AND RECOMMENDATION

For the reasons stated above, it is respectfully recommended that the decision of the Commissioner be **AFFIRMED**.

Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 6.02 within fourteen (14)

days of the date of its filing shall bar an aggrieved party from a *de novo* determination by
the district court of issues covers in the report and shall bar an aggrieved party from
attacking the factual findings on appeal.

 **DONE AND ENTERED** at Fort Myers, Florida, this 24th day of January, 2012.


_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE




The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:


John R. Rudy, III, A.U.S.A.
Roberta D. Kushner, Esquire